NOT DESIGNATED FOR PUBLICATION

No. 117,570

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of
ALLEN DAVID TAYLOR.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID J. KAUFMAN, judge. Opinion filed February 16, 2018. Affirmed.

*Steven D. Mank*, of Ariagno, Kerns, Mank & White, L.L.C., of Wichita, and *Kristen B. Patty*, of Wichita, for appellant.

*Dwight R. Carswell*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MALONE and ATCHESON, JJ.

MALONE, J.: Allen David Taylor appeals his involuntary, civil commitment as a sexually violent predator under the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 59-29a01 et seq. Taylor is severely mentally ill, and he was virtually incapable of meaningful participation in any of his commitment proceedings. Taylor claims his right to due process was violated because, due to his severe mental illness, he was unable to remain physically present at his bench trial, let alone understand the nature of the proceedings or assist his counsel in his defense. Taylor also claims there was insufficient evidence presented at the bench trial to establish that he was likely to commit repeat acts of sexual violence. For the reasons stated herein, we affirm the district court's judgment.

1

In 1985, Taylor pled guilty to indecent liberties with a child, and in 1997 he pled guilty to two counts of aggravated indecent liberties with a child. For the 1997 convictions, Taylor was sentenced to 224 months in prison with a postrelease period of 36 months. Taylor was serving his sentence at Larned Correctional Mental Health Facility, and he was scheduled to complete his sentence on or about June 28, 2015. In anticipation of Taylor's pending release, the State filed a petition seeking to have Taylor civilly committed under the KSVPA, and the district court appointed counsel to represent Taylor throughout the proceedings.

The district court held a probable cause hearing on June 26, 2015. At that hearing, the State's first witness was Taylor because he either refused or did not have the ability to stipulate to his identity as the respondent. The State's next witness was Dr. Derek Grimmell, a clinical psychologist. Highly summarized, Grimmell testified that Taylor suffered from antisocial personality disorder and that he was likely to sexually reoffend in the future based on multiple factors. Based on this testimony, the district court found probable cause to believe that Taylor was a sexually violent predator.

On March 4, 2016, the State filed a motion in limine. In that motion, the State argued, among other things, that our Supreme Court ruled in *In re Care & Treatment of Sykes*, 303 Kan. 820, 824-25, 367 P.3d 1244 (2016), that neither the Constitution nor any statute required that Taylor be competent before being civilly committed under the SVPA. Taylor did not file a response to the State's motion.

On August 19, 2016, the district court heard oral argument on the State's motion in limine. The State argued that it would be irrelevant and prejudicial for Taylor to claim incompetency because *Sykes* held that a respondent need not be competent for civil commitment purposes and competency did not relate to any element of being a sexually

2

violent predator. In response, Taylor informed the district court that he would not argue incompetency as a defense to the fact-finder. After reviewing *Sykes* with the parties, the district court ruled that Taylor could not argue incompetency as a defense but he could examine witnesses' diagnoses regarding mental health issues.

On August 22, 2016, the district court held the first day of a three-day bench trial. As the trial began, without objection, the district court took judicial notice of Taylor's prior convictions. The State called Taylor as its first witness. For over 20 minutes, the State attempted to question Taylor, but his answers were incoherent and unresponsive. The State eventually gave up trying to question Taylor.

The State next called Dr. Rebecca Farr, a psychologist who worked at Larned State Hospital. After going through her credentials, Farr recounted her initial attempts to interview Taylor. Each attempt was unsuccessful because Taylor refused to cooperate. Based on Taylor's medical records and other documents, Farr diagnosed him with antisocial personality disorder, child sexual abuse, alcohol use disorder, schizophrenia, and borderline intellectual functioning. Because of these disorders, Farr testified that Taylor is likely to engage in repeat acts of sexual violence. Farr also testified that Taylor had serious difficulty controlling his dangerous behavior. Farr explained various actuarial tests taken by Taylor, all of which indicated an increased chance to reoffend. On cross-examination, Farr testified that Taylor would benefit from future sexual offender treatment as long as he was medicated.

The State called Grimmell as its next witness on the second day of trial. Grimmell testified that he also diagnosed Taylor with antisocial personality disorder. After observing Taylor in person at trial, Grimmell became convinced that Taylor also suffered from schizophrenia. Based on these diagnoses, Grimmell testified that Taylor was a menace to the health and safety of others. Grimmell further provided more in depth testimony regarding the actuarial tests, concluding that the tests indicated Taylor was at

an increased risk to reoffend. Grimmell went on to testify that Taylor had serious difficulty controlling his dangerous behavior.

Taylor was disruptive throughout the trial, refusing to be quiet and often yelling obscenities, but on the third day of trial his behavior deteriorated even further. The district court noted for the record that, according to the deputies, the prior night and that morning Taylor was not able to control himself. In fact, deputies brought Taylor to the courtroom in a wheelchair in an attempt to control his aggressive behavior. After making a careful record of the events that had taken place in and out of the courtroom, the district court ordered that Taylor be removed from the courtroom for the remainder of the bench trial. Believing that Taylor was not competent to assist in the trial anyway, his attorney had no objection to the removal.

After Taylor's removal from the courtroom, the defense called Dr. Jarrod Steffan, a clinical psychologist, as its only witness. As with Farr and Grimmell, Steffan was not able to evaluate Taylor in person because of Taylor's noncompliance. Steffan testified that he agreed with the State's experts diagnosing Taylor with antisocial personality disorder. Steffan then disagreed with Farr and Grimmell regarding whether Taylor was likely to engage in repeat acts of sexual violence. Instead, Steffan testified that Taylor was no more likely to reoffend than most other sexual offenders. After the defense rested and closing arguments, the district court took the matter under advisement.

The district court issued its memorandum decision on September 1, 2016. In the written decision, the district court found that the State had proven beyond a reasonable doubt that Taylor was a sexually violent predator as defined by K.S.A. 2016 Supp. 59-29a02(a). The district court specifically found that: (1) Taylor had previously been convicted of a sexually violent crime; (2) Taylor suffers from antisocial personality disorder, among other diagnoses; (3) Taylor's actuarial tests placed him in the moderate and moderate/high category for reoffending; (4) Taylor never had any sexual offender

4

treatment; (5) Taylor had committed multiple prior acts of violence; and (6) Taylor was not able to control his sexually violent behavior.

On September 28, 2016, the district court filed its journal entry committing Taylor to the custody of the Secretary of the Department of Aging and Disability Services. Taylor filed a notice of appeal from the district court's judgment.

DUE PROCESS CLAIM

Taylor first claims his due process rights were violated because, due to his severe mental illness, he was unable to remain physically present during his commitment trial, let alone understand the nature of the proceeding or assist his counsel in his defense. Taylor argues that "[e]ither *Sykes* is wrongly decided, or an exception must be carved out to accommodate a respondent as severely mentally ill" as him. He further argues that the decision in *Sykes* "infringes on a district judge's duty to protect a party's rights" in a proceeding under the KSVPA. He acknowledges that the Court of Appeals is duty bound to follow Kansas Supreme Court precedent absent some indication the court is departing from its previous position. Taylor candidly states that he is preserving his argument that *Sykes* should be reconsidered for a subsequent petition for review, and he points out that, of late, "the Supreme Court has changed its mind on a number of other issues."

The State contends that as the Kansas Supreme Court held in *Sykes*, due process does not require that a person be mentally competent to be committed as a sexually violent predator. The State argues that Taylor has provided no basis for concluding that his removal from the courtroom under the circumstances of this case violated his due process rights.

We note that Taylor does not argue that the district court abused its discretion by removing him from the courtroom because of his disruptive behavior; instead, Taylor

5

asserts only his due process claim on appeal. "Whether a party's constitutional right to due process has been violated is a question of law subject to de novo review. [Citations omitted.]" *Sykes*, 303 Kan. at 823.

The KSVPA governs the involuntary civil commitment of sexually violent predators. See K.S.A. 2016 Supp. 59-29a01et seq. The KSVPA targets sexually violent predators who have a mental abnormality or personality disorder and who are likely to engage in repeat acts of sexual violence if not treated for their condition. K.S.A. 2016 Supp. 59-29a01(a). The Legislature enacted the KSVPA based on its determination that the general civil commitment procedures governing care and treatment for mentally ill persons are inadequate to address the special needs of sexually violent predators and the risks they present to society. K.S.A. 2016 Supp. 59-29a01(a).

To protect against a suspected offender being wrongfully committed, the KSVPA sets out numerous procedural requirements, resembling that of a criminal trial. These procedural requirements include: appointed counsel, a probable cause hearing, appointment of qualified experts for examinations, a jury trial requiring a unanimous decision, appeals, annual examinations, discharge petitions, and proof of being a sexually violent predator beyond a reasonable doubt. *Sykes*, 303 Kan. at 824 (citing *In re Care & Treatment of Hay*, 263 Kan. 822, 831, 953 P.2d 666 [1998]). While the procedures may resemble that of a criminal trial, commitment under K.S.A. 2016 Supp. 59-29a01 is civil. *Kansas v. Hendricks*, 521 U.S. 346, 369-71, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997).

In a criminal case, a person is deemed incompetent to stand trial when he or she is charged with a crime and, because of mental illness or defect, is unable to understand the nature and purpose of the proceedings or to make or assist in his or her defense. K.S.A. 22-3301. The Kansas criminal code establishes proceedings to determine a defendant's competency and also provides for the commitment of an incompetent defendant, subject to certain limitations, until he or she is deemed to be competent to stand trial. K.S.A.

6

2016 Supp. 22-3302; K.S.A. 2016 Supp. 22-3303. However, the KSVPA contains no provisions that require a respondent to be mentally competent to assist in his or her own defense in order to be civilly adjudicated as a sexually violent predator.

In 2016, in *Sykes*, our Supreme Court addressed the precise issue that Taylor is raising on appeal, i.e., whether competency is required for the State to civilly commit a sexually violent offender. Sykes previously had been convicted of burglary and aggravated sexual battery. Prior to his release from prison on those convictions, the State attempted to have him civilly committed under the KSVPA. After finding probable cause that Sykes was a sexually violent predator, the district court transferred him to Larned State Hospital for a psychiatric evaluation. Following the evaluation, the district court initially determined that Sykes was not competent, pursuant to K.S.A. 22-3301, for a civil commitment trial. The district court ordered that he continue to be evaluated and treated at the Larned facility under K.S.A. 22-3303.

Three years later, following further competency evaluations, the district court found that K.S.A. 22-3301 did not apply to civil commitment proceedings. The district court then held a bench trial to determine whether Sykes should be civilly committed under the KSVPA. The State's expert witness testified that she attempted to interview Sykes before he became too upset to continue a dialog. Sykes appeared as a witness on his own behalf at the trial, but his answers to questions from his counsel were generally meandering and nonresponsive. The district court ultimately ruled that Sykes was a sexually violent predator and ordered him to be committed until such time that it would be safe for him to be at large.

On appeal, the sole issue was whether due process requires that a respondent be competent to understand the nature of a sexually violent predator commitment proceeding and be able to assist counsel in such a proceeding. Citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), the court identified a

7

three-part test to determine the extent of protection due to a respondent in an involuntary commitment proceeding: (1) the liberty interest at stake; (2) the risk of erroneous deprivation of that liberty interest with the existing procedures and the probable value, if any, of additional safeguards; and (3) the government interest, including costs and administrative burdens of additional procedures. *Sykes*, 303 Kan. at 825. Our Supreme Court noted that Washington and at least seven other states applying the three-part test have determined that due process does not require mental competence of individuals subject to commitment as sexually violent predators. 303 Kan. at 826.

Ultimately, our Supreme Court in *Sykes* held that mental incompetence is not a defense in a civil action under the KSVPA. 303 Kan. 820, Syl. ¶ 1. The court further held that the KSVPA complies with constitutional requirements for substantive and procedural due process and a respondent is not required to be mentally competent to assist in his or her own defense in order to be civilly adjudicated a sexually violent predator. 303 Kan. 820, Syl. ¶¶ 2-3.

In a concurring opinion, Justice Lee Johnson noted that some of the decisions from other state courts cited by the majority included dissenting opinions, and he discussed some of those dissenting opinions. He opined that the result reached by the majority is a much closer call than suggested by that opinion, so in another case, the result could be different. 303 Kan. at 828. He concluded that the majority opinion in *Sykes* stretches due process near, if not past, its breaking point. 303 Kan. at 833.

Returning to our case, there is no question that Taylor was incompetent at the time of the commitment proceedings to the extent that he was unable to understand the nature of the proceedings or to assist his counsel in his defense. However, based on *Sykes*, the district court correctly determined that Taylor was not required to be competent to be civilly committed under the KSVPA. Taylor attempts to argue that his case can be distinguished from *Sykes* because Taylor appears to be even more incompetent than the

8

respondent in *Sykes*. However, *Sykes* did not hold that the competency of a respondent during a sexually violent predator commitment proceeding should be determined on a case-by-case basis. Rather, *Sykes* clearly holds that the procedures for establishing competency for criminal defendants do not apply in any civil commitment proceedings under the KSVPA. 303 Kan. at 824-27. In particular, *Sykes* holds: "Mental incompetence is not a defense in a civil action." 303 Kan. 820, Syl. ¶ 1.

As Taylor acknowledges, this court is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 629-30, 349 P.3d 1283 (2015), *rev. denied* 303 Kan. 1078 (2016). Since *Sykes* was decided in 2016, there has been no indication that our Supreme Court is departing from its holding in that case. Thus, we conclude that Taylor's due process rights were not violated because he was incompetent to understand the nature of the proceedings or to assist in his own defense at his commitment trial.

SUFFICIENCY OF THE EVIDENCE

Next, Taylor claims there was insufficient evidence to support his commitment as a sexually violent predator. In particular, Taylor argues that the State failed to prove that he is likely to commit repeat acts of sexual violence. As part of his challenge to the sufficiency of the evidence, Taylor contends that he should have been committed as mentally ill, under K.S.A. 2016 Supp. 59-2946(f)(1) and K.S.A. 2016 Supp. 59-2966(a), rather than as a sexually violent predator. The State responds by asserting that it presented sufficient evidence to support Taylor's civil commitment under the KSVPA.

When presented with an issue of whether evidence was sufficient to sustain the State's burden of proof in a sexually violent predator case, this court's standard of review asks whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced a reasonable factfinder could have found the State met its burden

9

to demonstrate beyond a reasonable doubt that the individual in question is a sexually violent predator. See *In re Care & Treatment of Colt*, 289 Kan. 234, 243-44, 211 P.3d 797 (2009); *In re Care & Treatment of Hay*, 263 Kan. 822, 842, 953 P.2d 666 (1998).

"'Sexually violent predator' means any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence." K.S.A. 2016 Supp. 59-29a02(a). Our Supreme Court interprets this definition as requiring the State to prove four elements beyond a reasonable doubt:

> "(1) [T]he individual has been convicted of or charged with a sexually violent offense, (2) the individual suffers from a mental abnormality or personality disorder, (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and (4) the individual has serious difficulty controlling his or her dangerous behavior. See K.S.A. 2010 Supp. 59-29a02(a); [*Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002)]; PIK Civ. 4th 130.20." *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011).

On appeal, Taylor is only challenging that the State failed to prove the third element. "'Likely to engage in repeat acts of sexual violence' means the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." K.S.A. 2016 Supp. 59-29a02(c).

At the commitment trial, Farr expressly testified that Taylor was likely to engage in repeat acts of sexual violence because of his mental health diagnoses. Farr based that conclusion on the following facts: (1) Taylor's noncompliance with his medication; (2) his severe and persistent mental illness; (3) his repeated deviant behavior even when compliant with his medication; (4) his lack of treatment; (5) his repeated pattern of violence, including sexual violence; (6) his substance abuse history; and (7) his actuarial tests placed him in the moderate and moderate/high risk category for reoffending.

10

Grimmell confirmed Farr's assessment of Taylor. He testified that Taylor had a propensity to commit acts of sexual violence to such a degree as to pose a menace to the health and safety of others. Grimmell based this conclusion on Taylor's actuarial test scores, on the age of his victims, on his noncompliance with supervision, and on other factors. Grimmell concluded that Taylor was twice as likely to reoffend as other sex offenders and stated: "So you look at things like personality disorder, unstable mental illness, things like that. This is the picture of a high risk, high need offender. And in a high risk/high need offender, the risk about doubles compared to the routine samples."

Taylor challenges the State's evidence by pointing out that neither Farr nor Grimmell completed an in-person evaluation of him. He also points out that he had no prison disciplinary record for sexual misconduct. Taylor notes that his expert witness, Dr. Steffan, disagreed with Farr and Grimmell regarding whether Taylor was likely to engage in repeat acts of sexual violence. Finally, Taylor asserts that he was never offered sexual offender treatment while incarcerated.

As the State points out, appellate courts do not reweigh the evidence, determine the credibility of witnesses, or resolve conflicts in evidence. *Williams*, 292 Kan. at 104. Both Farr and Grimmell expressly testified that Taylor is likely to engage in future acts of sexual violence, and the witnesses provided reasons for reaching that conclusion. The district court found their testimony credible. Viewing the evidence in the light most favorable to the State, the State presented sufficient evidence to establish that Taylor was likely to commit repeat acts of sexual violence, consistent with the statutory definition of a sexually violent predator.

Finally, as part of his challenge to the sufficiency of the evidence, Taylor briefly contends that he should have been committed as mentally ill under K.S.A. 2016 Supp. 59-2946(f)(1) and K.S.A. 2016 Supp. 59-2966(a), rather than as a sexually violent predator. To support this claim, Taylor points to this court's decision in *In re Care &*

11

*Treatment of Sawyer*, No. 108,031, 2013 WL 1729263 (Kan. App. 2013) (unpublished opinion). In *Sawyer*, the respondent was already a patient in the sexual predator program when his psychiatrist filed a separate petition to determine whether he was subject to involuntary commitment under K.S.A. 59-2946(f)(1) and K.S.A. 59-2966(a). The district court found that the respondent was mentally ill under the general statutes governing care and treatment for mentally ill persons. 2013 WL 1729263, at *1. Ultimately, this court affirmed the district court, finding sufficient evidence to support the respondent's involuntary commitment. 2013 WL 1729263, at *2-4.

Taylor does not explain why it would be appropriate to civilly commit him under the general statutes governing care and treatment for mentally ill persons despite his lack of competency to understand the proceedings, but at the same time he claims to be incompetent for civil commitment proceedings under the KSVPA. Moreover, Taylor's argument ignores the evidence presented at his trial that Taylor is, in fact, a sexually violent predator under the statutory definition of the term, i.e., (1) Taylor has been convicted of sexually violent offenses, (2) he suffers from a mental abnormality or personality disorder, (3) he is likely to commit repeat acts of sexual violence because of his mental abnormality or personality disorder, and (4) he has serious difficulty controlling his dangerous behavior. See K.S.A. 2016 Supp. 59-29a02(a).

As previously stated, the Kansas Legislature has determined that the general civil commitment procedures governing care and treatment for mentally ill persons are inadequate to protect the public from sexually violent predators. See K.S.A. 2016 Supp. 59-29a01(a). There is nothing in *Sawyer* that remotely holds, or even implies, that persons who are eligible for civil commitment under the general statutes governing care and treatment for mentally ill persons are not also eligible for civil commitment under the KSVPA. Our Supreme Court touched upon this subject in *Sykes* and stated:

12

"The second remedy is to commit [Sykes] for treatment as a mentally ill person subject to involuntary commitment under K.S.A. 59-2945 *et seq*. This remedy, while providing care and treatment for the mental illness, appears to beg the question presented in this appeal: he still ends up institutionalized without being competent to represent himself at a commitment hearing, albeit under a different statutory provision than the Sexually Violent Predator Act.

"Although Sykes contends that the treatment for his condition as a sexual predator is not sufficiently targeted to treatment of his other disorders, the State is not required to choose between attacking every aspect of a public danger or not attacking any part of the danger at all. The legislature is free to recognize degrees of harm, and it may address restrictions to those cases where it deems the need to be most clear. [Citation omitted.] In this instance, the State has chosen treatment of the sexual predatory mental defect as having a priority over schizophrenia or other mental disorders." 303 Kan. at 827.

To sum up, the State is not required to civilly commit Taylor under the general statutes governing care and treatment for mentally ill persons, even though it appears that he probably would qualify for commitment under those statutes. Instead, the State chose to civilly commit Taylor as a sexually violent predator, and there was sufficient evidence at trial to support his commitment under the KSVPA.

Affirmed.

* * *

ATCHESON, J., concurring:  Although I concur in the conclusions that Allen David Taylor need not be mentally competent to be adjudged a sexually violent predator and that the evidence presented to the Sedgwick County District Court showed him to be a sexually violent predator, my concurrence is compelled by the Kansas Supreme Court's decision in *In re Care & Treatment of Sykes*, 303 Kan. 820, Syl. ¶ 3, 367 P.3d 1244

13

(2016). The court held in *Sykes* that persons wholly unable to understand the proceedings against them or to assist their lawyers in any meaningful way may be deprived of their liberty for an indeterminate time as sexually violent predators—in all likelihood for the rest of their lives—for treatment that could not possibly be effective given their diminished mental capacity. In my view, the result in *Sykes* cannot be squared with the fundamental concepts of procedural due process protected in the Fourteenth Amendment to the United States Constitution. Were I free to do so, I would find that Taylor's due process rights were violated and his adjudication as a sexually violent predator should be reversed. Given the record evidence in this case, I presume the State could then successfully seek the involuntary civil commitment of Taylor as a mentally ill person in need of treatment, a process that would effectively aim to restore his mental competency. Once competent, Taylor could then be fairly adjudicated in a sexually violent predator proceeding.

I.

I begin with an undisputed and irrefutable fact: Taylor was mentally incompetent during the bench trial in this case. He did not understand what was happening to him, and he was of no help to his lawyer in responding to the State's evidence. The district court did an admirable job in navigating through the trial, despite Taylor's disruptive behavior—behavior everyone agrees was the product of Taylor's mental illness rather than some ploy to obstruct the proceedings. The precise cause of Taylor's incompetency isn't entirely clear from the record, although two of the mental health experts testified that Taylor suffers from schizophrenia among other psychological disorders. In light of *Sykes*, Taylor's mental incompetence did not present a material issue at trial, so the experts did not delve deeply into it.

Here, the State filed a petition to commit Taylor under the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 59-29a01 et seq. To prevail at trial on the

14

commitment petition, the State had to prove beyond a reasonable doubt Taylor: (1) had been convicted of or charged with a crime designated as a sexually violent offense; (2) has a mental abnormality or personality disorder; (3) is likely to commit an act of sexual violence because of that abnormality or disorder; and (4) displays serious difficulty controlling his dangerous behavior. *In re Care & Treatment of Williams*, 292 Kan. 96, Syl. ¶ 3, 253 P.3d 327 (2011); see K.S.A. 2016 Supp. 59-29a02(a). The KSVPA commitment proceeding is considered a civil action rather than a criminal prosecution because Taylor is being detained for treatment as a sexually violent predator rather than for punishment of an illegal act. Those individuals committed under the KSVPA have been adjudged to suffer from what amounts to an irresistible impulse or compulsion to engage in sexually aggressive, antisocial conduct, rendering them dangerous to others at some indefinite time if not confined. The psychological condition is a narrow one not directly connected to Taylor's inability to participate meaningfully in the adjudication process.

Notwithstanding the generic labeling of a KSVPA adjudication as a civil proceeding, what Taylor has at stake is a fundamental liberty interest protected by the Due Process Clause. See *Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004) ("[T]he most elemental of liberty interests [is] the interest in being free from physical detention by one's own government."); *Foucha v. Louisiana*, 504 U.S. 71, 78-80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (government effort to involuntarily commit individual because of mental illness implicates substantive liberty rights and triggers procedural due process protections). Adjudicated sexually violent predators are confined in a treatment program on the grounds of the Larned State Hospital essentially until they are "cured" or deemed no longer dangerous. Although the conditions of confinement at the hospital may be less onerous than those imposed on convicted criminals as punishment in some particulars, the essential deprivation of liberty is the same. Persons confined for treatment under the KSVPA are not free to leave the hospital grounds, their contacts and communications with outsiders are materially constrained,

15

and they live in a heavily regimented environment in which limited privileges are doled out or withdrawn as means of promoting compliance with myriad rules and regulations. The deprivation of liberty is both qualitatively extreme and temporally indeterminate.

When the KSVPA was adopted in 1994, the Legislature found, as part of the justification for the Act, that sexually violent predators as a group tend to have antisocial personality disorders that "are unamenable" to recognized treatment methods. K.S.A. 59-29a01 (Furse 1994). That finding was deleted five years later. But we know that almost no one has successfully completed the treatment program. In a study released in April 2015, the State post audit legislative division reported that as of the end of 2014, 243 individuals were confined as sexually violent predators. In the preceding 20 years, 28 inmates had died while in the program, 13 had been discharged "by court order for technical reasons," and three had actually completed treatment. Legislative Division of Post Audit, *Larned State Hospital: Reviewing the Operations of the Sexual Predator Treatment Program, Part 2*, at 6 (2015). So the success rate, measured by release upon "successful" treatment, has been barely over 1 percent. According to the report, of the 243 current inmates, 110 had been in the program for at least 10 years. *Post Audit Report*, at 7. Successful treatment remains, as the Legislature originally represented, elusive and unlikely at the very best. And the numerical evidence establishes that a person committed under the KSVPA realistically has been deprived of his or her liberty for life.

In that respect, the liberty interest at stake in a KSVPA commitment proceeding is, for due process purposes, functionally equivalent to that in a criminal prosecution. Arguably, it may be constitutionally more substantial than the liberty interest bound up in a relatively low grade felony entailing a short, defined term of incarceration as punishment. As a general matter, however, due process protections are not parceled out in criminal cases based on the seriousness of a particular offense or the particular punishment, although Eighth Amendment considerations may come into play with especially severe punishment. *Solem v. Helm*, 463 U.S. 277, 294, 103 S. Ct. 3001, 77 L.

16

Ed. 2d 637 (1983); see *Ring v. Arizona*, 536 U.S. 584, 614, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) (Breyer, J., concurring) ("This Court has held that the Eighth Amendment requires States to apply special procedural safeguards when they seek the death penalty."). The Eighth Amendment, however, does not apply to Taylor because he is being treated rather than punished. Likewise, other specific constitutional protections afforded criminal defendants in the Fifth and Sixth Amendments do not accrue to Taylor despite his loss of liberty. In light of the multiple protections explicitly identified in the federal Constitution for criminal defendants, the United States Supreme Court has narrowly construed the Due Process Clause as a source of additional rights for them. See *Medina v. California*, 505 U.S. 437, 444, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). Nonetheless, the Court has long recognized that the Due Process Clause requires defendants in criminal prosecutions—facing the loss of their liberty—to be mentally competent to stand trial. 505 U.S. at 439. Competency for due process purposes entails "the capacity to understand the nature and object of the proceedings," to consult with a lawyer, and to assist in presenting a defense. *Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975).

Although KSVPA commitment proceedings are civil rather than criminal, the nomenclature does not alter the character of the liberty interest at stake. It does, however, channel the constitutional due process analysis to the considerably more elastic standards outlined in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). *Medina*, 505 U.S. at 442-43. Measured by the *Mathews* yardstick, constitutionally sufficient procedural due process requires that a person be afforded a right to be heard in a meaningful way before being deprived of "life, liberty, or property." U.S. Const. amend. XIV, § 1; *Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"); *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 94 L. Ed. 865 (1950) (The Due Process Clause "at a minimum" requires that "deprivation of life, liberty, or property by adjudication be preceded by notice and opportunity for

17

hearing appropriate to the nature of the case."). In *Mathews*, 424 U.S. at 335, the Court outlined factors to be considered in assessing the adequacy of procedural due process protections:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

See *Medina*, 505 U.S. at 443 (quoting *Mathews*, 424 U.S. at 335).

In short, the nature and extent of the due process protections must be calibrated to the significance of the individual's liberty interest or property right the government intends to impair or extinguish. *Mathews*, 424 U.S. at 349. The more important the interest or right at stake, the more elaborate the protections. See *Goldberg v. Kelly*, 397 U.S. 254, 262-63, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970). That really is the driving principle in fixing constitutional due process protections as weighed against the government's purpose and the burdens those protections may impose. *Hamdi*, 542 U.S. at 528-29.

The liberty interest here cannot be understated: Persons adjudicated and committed under the KSVPA will, for all practical purposes, be confined for the rest of their lives. The adjudication, then, requires especially sensitive procedural protections to satisfy the constitutional demands of the Fourteenth Amendment. Those protections necessarily include the mental competency of the individual the State seeks to commit, just as they would in a criminal prosecution in which the same kind of liberty interest hangs in the balance. This would seem an ineluctable conclusion: If the comparatively limited protections extended under the Due Process Clause to criminal defendants facing the loss of their liberty include being mentally competent, then sexually violent predators

18

facing a constitutionally indistinguishable loss should be due no less process, especially since any resulting burdens on the State are comparatively minor.

## II.

To my way of thinking, the *Sykes* decision misperceives that core reality and heaps upon that misperception a series of erroneous justifications for its ultimate result. The conclusion, then, necessarily deprives mentally incompetent persons, such as Sykes and Taylor, of constitutional due process in consigning them to what effectively amounts to incarceration for life.

The *Sykes* decision first justifies the commitment of a mentally incompetent person under the KSVPA because the proceeding is civil rather than criminal and mental competency typically is not required of a defendant sued in a civil action. 303 Kan. at 824-25. Although the premise (really a generality) is correct, it misses the point in allocating constitutional due process protections. Those protections are measured not by the labels of civil or criminal but by the substantive interests being adjudicated. In the run of civil cases, those interests are money damages sought as compensation for tortious injuries, contractual breaches, and similar violations of duties owed or promises made. So in typical civil cases, we have recognized that the financial interests of an incompetent party may be adequately protected through the appointment of a guardian to work with the party's lawyer. But we don't accept that sort of surrogate representation for incompetent defendants when liberty interests entailing incarceration are being adjudicated. Those are the liberty interests at issue here. That the State may act with beneficent rather than retributive intent toward the individual being committed under the KSVPA doesn't alter the diminution of liberty. Whether that diminution results from a civil commitment or a criminal prosecution, the individuals facing the loss of their freedom because of the government's action must be sufficiently in command of their faculties to understand what's going on and to assist their lawyers.

19

The *Sykes* court observes that mental incompetence is not a defense to a civil action. 303 Kan. 820, Syl. ¶ 1, 824. Although that, too, may be a true statement, it is irrelevant. Taylor does not contend his mental incompetence defeats the proceedings to adjudicate him under the KSVPA. He says the proceedings cannot go forward so long as he is incompetent. When he is restored to competency, the State may resume the adjudication. The court similarly points out that the competency statute in the Kansas Code of Criminal Procedure, K.S.A. 2016 Supp. 22-3302, does not apply here. 303 Kan. at 824. Again, that's correct but stands as little more than a legal non sequitur. Taylor asserts a constitutional due process right, not a statutory protection.

The court then suggests the due process protections recognized in the KSVPA are sufficient to dispense with any constitutional requirement that the individuals adjudicated be mentally competent. The statutory procedures are unquestionably elaborate. The KSVPA requires a preliminary determination the individual likely meets the definition of a sexually violent predator and affords the individual an evidentiary hearing in the district court at which the State must establish probable cause to support the involuntary commitment proceeding. See K.S.A. 2016 Supp. 59-29a03(g); K.S.A. 2016 Supp. 59-29a05(b). Assuming probable cause has been shown, the individual is entitled to a trial to the district court or a 12-person jury at which the State must prove its case for commitment beyond a reasonable doubt. A jury verdict must be by unanimous vote. K.S.A. 2016 Supp. 59-29a06; K.S.A. 2016 Supp. 59-29a07(a). At both the probable cause hearing and trial, the individual may be represented by a lawyer, and the district court is to appoint a lawyer for anyone unable to afford representation. K.S.A. 2016 Supp. 59-29a05(c); K.S.A. 2016 Supp. 59-29a06(b). The lawyer may cross-examine the State's witnesses and may call witnesses and offer other evidence showing the individual does not meet the requirements for commitment under the KSVPA. A person involuntarily committed under the KSVPA is then entitled to annual reviews to assess whether he or she should continue to be confined for treatment. K.S.A. 2016 Supp. 59-29a08.[1]

20

[1]Those rights broadly replicate protections afforded criminal defendants in felony cases—the right to appointed legal representation, the obligation of the State to prove its case beyond a reasonable doubt, and the requirement for a verdict from a 12-person jury. That parallelism doesn't make a KSVPA proceeding a criminal prosecution. But it implicitly recognizes the commonality of the fundamental liberty interest at stake in both a prosecution for a serious criminal offense and a KSVPA commitment proceeding.

Here, we are principally concerned with the efficacy of the procedural protections in the KSVPA aimed at preventing a wrongful deprivation of liberty as the result of an erroneous verdict or judgment at trial in favor of the State. The mental incompetency of the individual being adjudicated substantially reduces the utility of those protections and commonly would leave his or her lawyer at a marked disadvantage in attempting both to combat adverse evidence and to marshal favorable evidence. As the United States Supreme Court has explained:

> "'Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996) (quoting *Riggins v. Nevada,* 504 U.S. 127, 139-140, 112 S. Ct. 1810, 118 L. Ed. 2d 479 [1992] [Kennedy, J., concurring]).

Here, Taylor would have been no help to his lawyer in pointing out potentially inaccurate or incomplete testimony from the State's witnesses or similarly erroneous information on which the State's psychological experts relied in forming their opinions. He likewise could not have identified possible witnesses who might offer different accounts of relevant circumstances. Commonly, a party will be a valuable (if not always accurate) historian about many of the underlying facts bearing on the contested issues in a legal dispute headed for trial. That history may itself furnish useful evidence and, at the very

21

least, will open avenues of inquiry that might yield evidence or additional avenues to be explored. All of that was lost in this case.

During the trial, the State called two expert witnesses who prepared forensic psychological evaluations of Taylor. Taylor's lawyer called one. All of them wanted to interview Taylor as a material component of their evaluations and presumably would have had him take some recognized psychological tests as part of their assessments. Because of his active mental illness, Taylor could not meaningfully participate in those examinations, just as he offered nothing of legal value during the trial. The reliability of a forensic evaluation done without the subject's cooperation may well be diminished— otherwise there would be no point in soliciting that participation in the first place. It's hard to say that one side or the other was obviously more disadvantaged by Taylor's mental incompetence in preparing and presenting expert opinion evidence. But it is fair to conclude the truth-seeking function of the trial was adversely affected to some degree.

Because the State must prove its case beyond a reasonable doubt in a KSVPA commitment action and, concomitantly, the subject of the proceeding need only create a reasonable doubt, the risk of an erroneous deprivation of liberty may turn on a thin evidentiary margin in any given case. In other words, it doesn't necessarily take that much to generate a reasonable doubt. The loss or unavailability of even a limited amount of evidence favorable to the subject might tip the case to the State. That risk of an erroneous result is a factor in assessing what protections are necessary to satisfy the Due Process Clause. *Mathews*, 424 U.S. at 335. Plainly, the mental competence of an individual being involuntarily committed under the KSVPA enhances the overall reliability of the process and materially, though not necessarily quantifiably, reduces the likelihood of a wrongful commitment. In broad terms, the point of a reasonable doubt standard is to heavily weight the process against an erroneous deprivation. See *Rose v. Clark*, 478 U.S. 570, 580, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); *United States v. Clark*, 740 F.3d 808, 812-13 (2d Cir. 2014) (noting role reasonable doubt standard plays

22

in effectuating maxim that "it is better to let ten guilty persons go free than to convict one innocent person"). But that purpose is eroded if the individual cannot meaningfully understand, let alone assist in, the proceedings.

In *Kansas v. Hendricks*, 521 U.S. 346, 371, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997), the United States Supreme Court upheld the constitutionality of the KSVPA against a limited due process challenge and arguments that an involuntary commitment was sufficiently punitive to run afoul of the Ex Post Facto Clause of the United States Constitution and its Fifth and Fourteenth Amendment protections against double jeopardy in state criminal prosecutions. Leroy Hendricks, the individual committed under the KSVPA, was by all accounts mentally competent to stand trial. The issues he raised did not require the Court to consider whether a mentally incompetent person could be committed under the KSVPA. The Court did not address the point.

III.

Finally, the *Sykes* court seems to find committing incompetent persons under the KSVPA to be constitutionally acceptable because it's more convenient for the State than the alternatives and because those individuals likely would be detained under the general statutes for the involuntarily commitment of mentally ill persons, K.S.A. 59-2945 et seq. 303 Kan. at 826-27. The court also hints at some chance a mentally incompetent individual facing commitment under the KSVPA might be released from any form of detention. That appears improbable, and it is at odds with the other justifications the court advances for its conclusion.

An individual who appears to be dangerous in a way triggering a KSVPA proceeding *and* has deteriorated mentally to the point of being incompetent to stand trial almost certainly would be a mentally ill person subject to commitment for care and treatment under the general civil commitment statutes. See K.S.A. 2016 Supp. 59-

23

2946(f). To be involuntarily committed as a mentally ill person, an individual must have a "behavioral, psychological[,] or biological dysfunction" of such severity as to require treatment and because of that dysfunction must be unable to understand "the nature and effects of hospitalization or treatment" and must be incapable of "rational decision-making" about such mental health care. K.S.A. 2016 Supp. 59-2946(e), (f). In addition, an individual must be either: (1) likely to cause physical injury or abuse to himself or herself or a third person "in the reasonably foreseeable future"; or (2) unable to provide for his or her own needs such as food, clothing, or shelter, thus manifesting an inability to function without assistance. K.S.A. 2016 Supp. 59-2946(f). Although there may be some rare combination of mental impairments that would render a person incompetent to stand trial under the KSVPA yet beyond the reach of a general involuntary civil commitment for treatment, nothing in *Sykes* suggests that to be more than an abstract possibility, let alone a recurrent reality.

Taylor well illustrates that someone who is mentally incompetent to stand trial in a KSVPA proceeding would be subject to general civil commitment as a mentally ill person. Because of his schizophrenia, Taylor could not understand the legal proceedings against him. He would similarly be unable to understand his need for treatment and to rationally weigh treatment options. And from what is apparent in the trial transcript, his schizophrenia left him unable to care for himself. For those reasons alone, Taylor could be involuntarily committed for treatment. Moreover, Taylor's other psychological deficits the State contends make him likely to commit an act of sexual violence would also render him likely to cause physical abuse of another person.

That Taylor almost certainly would be involuntarily committed under the general procedures for the care and treatment of mentally ill persons presents a legally empty reason to curtail or abandon the constitutional due process rights he should receive in a KSVPA proceeding. If Taylor were committed under the general statutes, he would be confined for a limited, statutorily defined period that could be extended for continued

24

treatment of those conditions rendering him unable to care for himself. See K.S.A. 2016 Supp. 59-2966. If Taylor were successfully treated so that he could care for himself, he presumably would be restored to mental competency: The former, as defined in the commitment statutes, more or less requires the latter. Taylor could then be adjudicated under the KSVPA. As I have indicated, an involuntary commitment as a sexually violent predator would be considerably more onerous than a general civil commitment for treatment of a mental illness. Successful treatment (and release) under the KSVPA is, as a practical matter, virtually nonexistent. The same is not true for persons civilly committed as mentally ill.

Apart from those considerations, the premise that a mentally incompetent individual might be released outright also conflicts with a specific requirement of the KSVPA. If the State presents a district court with a facially sufficient petition for KSVPA commitment, the court must order that the named individual "be taken into custody and detained" until he or she is adjudicated. K.S.A. 2016 Supp. 59-29a05(a)(1). Mentally incompetent individuals, therefore, would be subject to continuing detention under that provision so long as they remained incompetent to stand trial. Although K.S.A. 2016 Supp. 59-29a05(a)(1) specifies pretrial confinement in jail, the district court could order the individual be held elsewhere—still in the formal custody of a county sheriff—if necessary to adequately address the causes of the individual's mental incompetency. The continued detention of a mentally incompetent individual in a jail setting without treatment or with inadequate treatment would raise constitutional concerns apart from those at issue here.

In short, neither Taylor nor anyone else facing commitment under the KSVPA would be turned loose because he or she is mentally incompetent to stand trial in that proceeding.

25

The *Sykes* court also suggests that the State would have no suitable place to treat mentally incompetent individuals awaiting adjudication under the KSVPA if they were held through the general commitment procedures for mentally ill persons. The court doesn't elaborate on the purported problem. But the State has facilities to detain and treat accused criminals who have been found incompetent to stand trial. Depending on the crimes charged, those individuals would present potential safety considerations comparable to Taylor or Sykes. Moreover, even under the general civil commit statutes, potentially dangerous persons may be held for treatment—that's a ground supporting involuntary commitment. See K.S.A. 2016 Supp. 59-2946(f) (likelihood person will cause physical injury or abuse to another supports civil commitment). So the State has recognized and already deals with confined individuals displaying a combination of mental incompetence or instability and potentially dangerous impulses.

The *Sykes* court submits that the State has opted to institutionalize individuals under the KSPVA rather than the general commitment statutes notwithstanding their mental incompetence. And the court then says it is simply effectuating that "priority." 303 Kan. at 827. But nothing in the two statutory schemes obviously creates such a hierarchy. The ordering rests more on the court's ruling that mental competence is irrelevant in a KSVPA adjudication than on any preexisting legislative architecture.

The rationale also misfires as a legal proposition. A legislative priority, however clearly established, cannot be the basis for negating a constitutional due process right. So the statutory schemes do not answer the question whether Taylor constitutionally must be competent to be adjudicated under the KSVPA. Moreover, the priority the court imputes would be grossly ineffective and, perhaps, irrational. The treatment protocols for individuals committed under the KSVPA presuppose the participants are mentally oriented and sufficiently coherent in their thinking to comprehend the information imparted in the therapeutic regimen. At the time of his trial, Taylor obviously was not. He cannot possibly benefit from the treatment program until his schizophrenia has been

26

controlled and he otherwise has been restored to a semblance of rationality. Due process considerations aside, if Taylor must be mentally competent, i.e., reasonably rational, to get anything from the program, then logic, which conveniently often dovetails with fairness, suggests the State should attempt to restore him to rationality before a KSVPA commitment trial rather than afterward.[2]

[2]The *Sykes* court cites decisions from eight other jurisdictions finding individuals need not be mentally competent to be involuntarily committed as dangerous sex offenders under statutory schemes generally comparable to the KSVPA. 303 Kan. at 826-27. Not surprisingly, those decisions rely, to greater or lesser degrees, on the arguments outlined in *Sykes* without ever rigorously defining the liberty interests at stake and inappropriately placing too much constitutional import on the civil label affixed to those schemes. It is unclear from those decisions whether the treatment programs in the other states are more successful than Kansas'. As I have said, for due process purposes, the statistically dismissal results under the KSVPA render its ostensibly indeterminate detention a deprivation of liberty for life.

I close by noting the obvious argument the court does *not* make in *Sykes*, since it would be entirely self-defeating. If Taylor were convicted today of aggravated indecent liberties with a child, he would receive a sentence of life in prison as a Jessica's Law offender. K.S.A. 2016 Supp. 21-6627(a)(1)(C). So, having been involuntarily committed under the KSVPA, he isn't any worse off when it comes to his liberty. But, of course, Taylor could not be tried and convicted of a Jessica's Law crime or any other offense unless he were mentally competent. The Fourteenth Amendment requires no less. Procedural due process insulates an individual's fundamental liberty interests from adverse government action whether those interests are at stake in a civil proceeding or a criminal one. And those constitutional protections may not be diluted or dispensed with altogether for the wholly disreputable or unsympathetic among us. The Due Process Clause plays no favorites that way.